## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

CVS PHARMACY, INC.,

                  Plaintiff,

   vs.

AMERICAN EXPRESS TRAVEL RELATED
SERVICES COMPANY, INC. and AMERICAN
EXPRESS COMPANY,

                  Defendants.

Civil Action No. 08-2316

Jury Trial Demanded

## FIRST AMENDED COMPLAINT

Plaintiff, CVS Pharmacy, Inc. ("CVS" or "Plaintiff") brings this complaint for treble damages and injunctive relief against defendants American Express Company ("American Express") and its wholly owned subsidiary American Express Travel Related Services Company, Inc. ("American Express Travel") (collectively referred to as "AmEx") pursuant to the antitrust laws of the United States.  For its complaint against defendants, Plaintiff states as follows:

### I.   Nature of the Action

1.     This is a civil antitrust action challenging the legality under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§1 and 2) of certain rules imposed on Plaintiff and other merchants by AmEx.  Specifically, Plaintiff is a retail merchant that has entered into an American Express Card Acceptance Agreement with American Express Travel (the "Agreement").   In this agreement, and in every other such agreement which American Express Travel has entered into with other merchants, AmEx requires that the merchant abide by certain anti-steering rules.  The anti-steering rules: (a) require that Plaintiff and other merchants accept all payment cards that bear the "American Express" name, trademark, servicemark or logo; and (b) prohibit Plaintiff

and other merchants from:  i) doing anything that would lead - or "steer" - a retail purchaser to use a lower priced payment card product than an AmEx card; ii)offering a retail customer, who had presented an AmEx card, any alternative (less expensive) payment card product; iii) "criticizing" the AmEx card or services; iv)publishing or stating a preference for any other (less expensive) payment card product; or v)promoting the use of any other (less expensive or higher quality) payment card over the use of AmEx cards.

2.     The purpose and effect of these anti-steering rules is: (a) to prevent Plaintiff and the other merchants with whom American Express Travel had contracted from charging retail customers who use an AmEx card for the higher cost to the merchant of that payment card product; (b) to prevent the merchants from discounting or lowering the price paid by retail customers who use payment products or methods that are less costly to the merchant than AmEx payment cards; and (c) to prevent merchants from truthfully informing retail customers that their use of an AmEx payment card imposes higher costs on the merchant than other payment card products or payment methods and that those higher costs result in higher retail prices to consumers.

3.     The anti-steering rules are anticompetitive in that they nullify the operation of the price mechanism by: (a) precluding consumers from learning that AmEx is a higher-cost payment product; (b) preventing consumers from receiving any price reduction for using a lower-cost form of payment than an AmEx payment card; and (c) eliminating any economic or competitive incentive for AmEx to lower its prices in order to avoid losing sales (measured in card transactions and/or card transaction volume).

4.     The result of these anti-steering rules is that: (a) the cost to the merchant and to the retail customer of using an AmEx card is opaque to the retail customer, who is the decision

maker as to what payment method to use; (b) AmEx is able to evade and nullify the operation of the price mechanism that, in the absence of the anticompetitive anti-steering rules, would lead merchants to charge lower prices to customers who used less costly payment methods than AmEx cards (or be able to credibly threaten to do so) which, in turn, would cause AmEx to reduce to a competitive rate the price it charges merchants; (c) merchants, including Plaintiff, are forced to raise the prices they charge to all customers - even those who do not use an AmEx card - in order to cover the high and anticompetitively elevated cost of transactions where the customer used an AmEx payment card; (d) AmEx is able to charge merchants supracompetitive prices for its payment card services and is further able to obtain and maintain monopoly power, which is the power to raise price substantially above the competitive level without losing so much sales volume as to render the price increase unprofitable; and (5) consumer welfare is reduced as the supracompetitive prices charged by AmEx are necessarily incorporated into the retail prices paid by all consumers.

5.     AmEx exploits its monopoly power, created and perpetuated by its anticompetitive steering rules, by charging retail merchants, including Plaintiff, supracompetitive monopoly prices for its payment cards services.  Indeed, the anti-steering rules were created and enforced by AmEx for the specific anticompetitive purpose of:(i) insulating AmEx from price competition from other payment forms or services; (ii) obstructing the operation of the price mechanism as described above; (iii) eliminating or dampening cross-elasticity of demand between AmEx and any other payment product; and (iv) allowing AmEx to maintain its monopoly power so that it can continue to charge supracompetitive prices without losing sales to other payment card products or other payment methods.  Thus, AmEx has monopolized or attempted to monopolize the market for the sale of American Express payment services to

merchants within the meaning of Section 2 of the Sherman Act (15 U.S.C. '2) and imposed on merchants anticompetitive contract terms that unreasonably restrained competition within the meaning of Section 1 of the Sherman Act (15 U.S.C. '1). Plaintiff seeks treble damages for the overcharges they have suffered and will suffer as a result of AmEx's unlawful conduct described in this Complaint, and injunctive relief to permanently enjoin the enforcement by AmEx of its Anti-Steering Rules.

## II.   Parties

6.     Plaintiff, CVS Pharmacy, Inc., is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island. CVS and its affiliated companies, among other things, own and operate over 7000 pharmacies and drug stores across the United States, including in this District, at which American Express cards are accepted as payment for goods and services. CVS has accepted and accepts AmEx payment cards pursuant to agreements with AmEx, including agreements dated December 1, 1996 and July 1, 2006. CVS has paid AmEx supracompetitive, artificially inflated payment card fees as a result of the anticompetitive rules that AmEx has imposed and continues to impose on CVS and other merchants. CVS brings this action individually and as the assignee of claims from CVS' affiliates. The references in the Complaint to "merchant(s)" include CVS and its assignors.

7.     Defendant, American Express Company ("American Express"), is a New York corporation with its principal place of business in New York, New York.

8.     Defendant, American Express Travel Related Services Company, Inc. ("American Express Travel"), is a Delaware corporation with its principal place of business in New York, New York. American Express Travel is a wholly owned subsidiary of American Express and is actively managed and controlled by American Express.

4

9.      American Express actively directed and participated in the anticompetitive acts alleged in this Complaint and determined that those acts be undertaken by itself and its wholly owned subsidiary, American Express Travel.

### III.    Jurisdiction and Venue

10.     The claims set forth in this Complaint arise under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§1 and 2) and seek treble damages pursuant to Section 4 of the Clayton Act (15 U.S.C. §15(a)).   Plaintiff also seeks injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. §26).   This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§1331 and 1337(a).

11.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act (15 U.S.C. §22) and 28 U.S.C. §1391, in that each Defendant is an inhabitant of this District or is found and transacts business in this District.

### IV.    Nature of Trade and Commerce

12.     AmEx provides financial services in interstate commerce throughout the United States.  In particular, AmEx provides payment card services to both consumers (*i.e.*, buyers) and to retail merchants (*i.e.*, sellers).

13.     A "payment card" is a wallet-sized plastic card that a purchaser can present to a merchant in order to effectuate payment for a purchase transaction.

14.     In order to provide payment card services, AmEx issues payment cards to millions of individuals and businesses, who are sometimes referred to in this Complaint as "cardholders."  AmEx and the cardholders agree that when the cardholder presents an AmEx payment card to a merchant and the merchant accepts the card in payment for goods or services, AmEx will advance payment to the merchant and bill the cardholder monthly in the amount of

the cardholder's AmEx payment card transactions.  The cardholder then pays AmEx the billed amount pursuant to payment plans that are available for different types of AmEx payment cards. For example, the AmEx Gold Card and AmEx Platinum Card are charge cards, in which the cardholder pays the full amount of his/her bill each month.  Other of the AmEx payment cards are revolving credit cards in which the cardholder has the option of paying the bill in full or carrying a balance due and paying interest on the unpaid portion of the bill.

15.     In addition to entering into agreements with cardholders for the issuance of payment cards, AmEx also enters into agreements with merchants for the acceptance of the AmEx payment cards.  Pursuant to these agreements, the merchants agree to obtain electronic authorization from AmEx to accept an AmEx payment card for a particular transaction and, if authorization is granted, to accept the AmEx payment card in satisfaction of payment for the goods or services.  AmEx, in turn, agrees to pay the merchant the amount of the authorized transaction less a "merchant discount fee."  The merchant discount fee, which is retained by AmEx, is the amount that AmEx charges the merchant for providing payment card services.

16.     The vast majority of AmEx's payment card services are delivered pursuant to the "Three-Party Model" described above.  In this system, the three parties are AmEx, the cardholder, and the merchant.

17.     AmEx also provides payment card services in the United States pursuant to a four-party model.  In this system, an AmEx trademarked or "logoed" credit card is issued to a cardholder by a bank that has entered into a license with AmEx.  The merchants who have entered into American Express Card Acceptance Agreements with AmEx are required by those agreements to accept all cards bearing the AmEx trademark or logo, including these bank-issued AmEx credit cards.

6

18.     In this four-party model, AmEx pays the merchant the transaction amount less the merchant's usual discount fee.  The issuing bank bills the cardholder for the amount of the transaction and pays that amount less an "issuer rate discount" to AmEx.  Because the merchant discount fee (*i.e.*, the fee retained by AmEx) is a higher percentage of the transaction than the issuer rate discount (*i.e.*, the fee retained by the issuing bank), the difference between the two generates a positive return for AmEx.

19.     During the relevant time period, AmEx's business grew enormously both in terms of the number of sales transacted with AmEx cards and the dollar volume transacted with AmEx cards.  This increase in the volume of AmEx's business and improved technology led to substantial reductions in AmEx's unit cost for providing payment card services to Plaintiff and other merchants.  Despite these declining unit costs, AmEx's price to Plaintiff and other merchants during the relevant time period increased at a significant rate and continues to do so.  In the absence of the anti-steering rules that are complained of in this Complaint, price competition would have prevented AmEx prices from rising so dramatically while its unit costs declined.

## V.     The Anti-Steering Rules and Their Anticompetitive Effects

20.     There are a number of ways that a retailer can use the price mechanism to steer retail customers to less expensive and more efficient payment forms.  These include:

a)      Offering the customer a discount for using a less expensive payment product such as a debit card, a less expensive credit or charge card or a check.  Such a discount would reward consumers who use less expensive payment products and drive consumers to such products.  The resulting loss of business, or the threat of loss, would - if not prevented by the anti-steering rules - cause high-cost payment services providers, such as AmEx, either to lower their price or suffer the competitive consequence of lower sales;

b)      Imposing on customers who use a high-cost payment product, such as an AmEx Card, a surcharge on account of the additional cost to the merchant of accepting that

high-cost payment product. Such a surcharge would invoke the price mechanism to dissuade many consumers from using expensive payment products and cause them to switch to less expensive payment forms. Again, the resulting loss of business, or threat of loss would - if not prevented by the anti-steering rules - cause high-cost payment service providers, such as AmEx, either to lower their prices or suffer the competitive consequence of lower sales;

c)      Verbally advising the customer at the check-out counter that the payment product they have presented, such as an AmEx Card, is a high-cost product that results in higher consumer prices and asking the customer to use a less expensive payment product;

d)      Posting signage in the retail stores identifying and stating a preference for less expensive payment products and explaining that more expensive payment products result in higher consumer prices;

e)      Posting decals on entryway doors and signs inside the store with the logo or trademark of less expensive payment methods and not posting the logo or trademark of the more expensive payment products, such as AmEx Cards;

f)      Taking any other action to direct consumers away from more expensive and toward less expensive payment products that merchants would devise if they were not constrained by the anti-steering rules from doing so.

21.      All of the agreements that AmEx entered into with merchants, including Plaintiff, strictly prohibit the merchants from engaging in any of these efficiency-enhancing, procompetitive practices and prevents the price mechanism from being used to direct consumers to lower-cost payment services or methods.

22.      More specifically, the American Express Card Acceptance Agreement that Plaintiff has entered into prohibits Plaintiff from: (a) offering a retail customer a discount for using a less-expensive payment product or payment card; (b) imposing a surcharge on retail customers who use AmEx's high-cost payment cards to effectuate purchase transactions; (c) truthfully informing customers that the AmEx payment cards are high-cost products that increase the merchants' costs of doing business and result in higher retail prices to consumers; (d) trying in any way to persuade, influence or steer a retail customer to use any alternative payment card

or payment method; (e) refusing to accept any payment card bearing AmEx's trademark, servicemark or logo - regardless of its cost; (f) failing to mention, orally or in a sign, that the AmEx card is a card the merchant accepts if the merchant mentions any card at all; (g) offering to effectuate a sales transaction with any other charge, credit or payment card when presented with an AmEx card; (h) truthfully criticizing AmEx's high prices or payment card policies; (i) stating or publishing a preference for any other payment card or charge, credit or debit service; and (j) promoting any charge, credit, debit or other card service more actively than it promotes AmEx.

23.     AmEx devotes significant resources to the aggressive enforcement of these anti-steering rules and cancels agreements with merchants who violate them by steering consumers to less expensive payment methods.  AmEx prefers to lose a merchant account rather than permit a cardholder/consumer to knowingly choose to spend less money by using a less expensive payment product than an AmEx Card.

24.     The intended purpose and actual effect of AmEx's anti-steering rules are to almost totally insulate AmEx from price competition from other providers of payment card services to merchants.  A potential competitor might offer high quality payment card services to merchants at a fraction of the price charged by AmEx, but this pro-competitive strategy would not have allowed the potential competitor to gain market share.  This is because the anti-steering rules would prevent the merchant from using the price mechanism or truthful procompetitive market information to induce consumers to use the lower cost payment card product.

25.     The anti-steering rules ensure: (a) that the cost to the merchant of the cardholder using an AmEx Card is unknown to the cardholder at the point of sale; and (b) the cardholder has no economic incentive, such as the ability to receive a lower price, to use a less expensive

payment method.  Thus, the anti-steering rules allow AmEx to completely extinguish at the point of sale cross-elasticity of demand between its product and other payment card products such as MasterCard, Visa, or Discover; render AmEx virtually impervious to price competition; and allow AmEx to maintain its monopoly power and continue to charge supracompetitive prices to merchants without losing any sales.

26.     Theoretically, each individual merchant could, of course, simply refuse to accept AmEx Cards.  As a practical matter, however, such a decision is not economically feasible or realistic for the merchants.  Many of Plaintiff's customers and other merchants' customers regularly use an AmEx Card, and if the merchant stopped accepting AmEx Cards, then it would lose many of those customers to competitive retailers who accept AmEx card products.  The profits lost as a result would be greater than the anticompetitive overcharge suffered at the hands of AmEx.  This is true for the vast majority of large retailers and retail chains in the United States.

27.     In the absence of AmEx's anti-steering rules, the supra-competitive fees that AmEx is able to charge Plaintiff and other merchants for payment card services would be greatly diminished.  Merchants would incur lower fees and pass along the benefits to consumers in the form of lower prices.

28.     The anti-steering rules ensure that Plaintiff and other merchants, who must recover their costs of doing business from the prices they charge, must raise prices to all customers, including cash customers, debit card users and those who would otherwise seek to avoid the high cost of AmEx's payment card services.  In the absence of the anti-steering rules, the merchants, through discounting or surcharging, would be free to impose the high AmEx charges only on customers who choose to use the expensive AmEx payment card.

29.     The anti-steering rules also result in inefficient and anticompetitive subsidies running from the least affluent consumers to the most affluent.  Because merchants must increase the price of all goods to cover the cost of accepting AmEx's payment cards, the anti-steering rules effectively result in cash customers and users of other low-cost payment forms paying higher retail prices to cover the cost of payment card services and benefits, including frequent flyer miles, car rental insurance, and free gifts and other rewards that are received by the AmEx cardholders.

30.     The anti-steering rules have had and continue to have a substantially adverse effect on competition, and have and continue to result in higher prices and lower output than would exist in the absence of those rules.  There are no procompetitive justifications for the anti-steering rules, and even if there were, there are less restrictive means for achieving those purported justifications.

## VI.     Market Definition and Monopoly Power

31.     The relevant market consists of a geographic market and a product market.

32.     The relevant geographic market is the United States.

33.     The relevant product market is AmEx payment card services provided to merchants, including authorization, settlement and clearance.   Due to the anticompetitive conduct alleged in this Complaint there is virtually no cross-elasticity of demand between AmEx payment card services and other payment card services such as MasterCard, Visa or Discover or between AmEx payment card services and other methods of payment.   AmEx's anti-steering rules eliminate any incentive by other payment card vendors to charge lower fees than AmEx (and vice versa) because those lower fees will not be visible to consumers and thus will not lead to increased usage.   Those rules thereby sever the connection that would exist in a properly

11

functioning market between higher merchant fees and lower AmEx card usage.

34.    In the relevant market, the seller is AmEx and the purchasers are merchants such as Plaintiff.  The "merchant discount fee" is the price paid to AmEx by the merchants for the payment card services.  Retail merchants as a group pay billions of dollars per year to purchase AmEx payment card services.

35.    AmEx possesses monopoly power within the relevant market.  More specifically, during the relevant time period, AmEx has had and continues to have the power to raise the merchant discount fee substantially above the competitive level without losing sufficient business to make the price increase unprofitable.  It is not economically feasible for merchants simply to stop accepting AmEx payment cards, and the price mechanism cannot be used to steer AmEx cardholders to lower cost payment methods due to the anti-steering rules.  As a result, AmEx has the power to raise its prices to supracompetitive monopoly levels unfettered by competitive pressure and completely shielded from the proper functioning of the price mechanism or cross-elasticity of demand.

36.    AmEx's monopoly power is demonstrated by, among other things:  (a) its ability to raise the merchant discount fees without losing business to other sellers of payment card services or other payment methods; (b) its ability to price discriminate by charging different merchant classes and types significantly different prices; (c) its ability to substantially raise prices while its unit costs are decreasing and sales volume is increasing; (d) the fact that increasing prices have led to increasing sales, instead of decreasing sales; (e) its ability to set the merchant discount fee without regard to the cost of providing payment card services to the merchants and without fear that its increasing prices would cause retail customers to switch to any other payment card or method; (f) its abnormally high price/cost margin; and (g) its ability to

force merchants to accept the anti-steering rules.

37.     There are significant barriers to entering into the business of providing payment card services.  No company has successfully entered this line of business since 1985.  Entry is estimated to cost over $1 billion to overcome the impediment to market entry of having enough cardholders to induce merchants to accept the cards before having signed up enough merchants to induce consumers to become cardholders - and vice versa.  In addition, as explained above, the existence of the anti-steering rules is itself a significant barrier to entry.

### VII.   Violations Alleged

### Count I:
### Monopolization in Violation of §2 of the Sherman Act

38.     Plaintiff realleges paragraphs 1-37 as set forth above.

39.     AmEx possesses monopoly power in the relevant market and has and continues to willfully exercise that power to set the prices that merchants, including Plaintiff, pay for AmEx payment card services at levels that are substantially above the competitive rate.

40.     AmEx's monopoly power has been willfully obtained and is maintained by anticompetitive conduct, namely, the imposition on Plaintiff and other merchants of its anti-steering rules.  Those anti-steering rules ensure that AmEx will be immune to the competitive impact of the price mechanism and that no competitor can take sales transactions away from AmEx by offering lower prices or more efficient payment card services.

41.     AmEx's monopoly power has not been achieved by superior skill, business acumen or historic accident.

42.     As a direct and proximate result of AmEx's anticompetitive conduct, Plaintiff has been injured in its business or property by: (a) being compelled to adhere to the anti-steering

rules; and (b) being charged supra-competitive, monopoly prices by AmEx that far exceeded the prices that would have been obtained in an unfettered market in the absence of the anti-steering rules.

43.     As a direct and proximate result of AmEx's willful maintenance of its monopoly power, Plaintiff is threatened with continuing loss or injury for which it has no adequate remedy at law.  Plaintiff will continue to suffer irreparable injury unless AmEx's anticompetitive conduct and its enforcement of the anti-steering rules are enjoined by this Court.

## Count II:
### Attempt to Monopolize in Violation of §2 of the Sherman Act

44.     Plaintiff realleges paragraphs 1-43 as set forth above.

45.     There is a dangerous probability that, if not enjoined by this Court, AmEx will obtain or maintain monopoly power in the relevant market.

46.     As alleged above, AmEx has devised and imposed the anti-steering rules on Plaintiff and other merchants for the specifically anticompetitive purpose and with the specifically anticompetitive effect of insulating itself from price competition and obtaining and maintaining monopoly power.

47.     As a direct and proximate result of AmEx's anticompetitive conduct, Plaintiff has been injured in its business or property by:  (a) being compelled to adhere to the anti-steering rules; and (b) being charged supra-competitive, monopoly prices by AmEx that far exceeded the prices that would have been charged in an unfettered market in the absence of the anti-steering rules.

48.     As a direct and proximate result of AmEx's willful maintenance of its monopoly power, Plaintiff is threatened with continuing loss or injury for which each of them has no

adequate remedy at law.  Plaintiff will continue to suffer irreparable injury unless AmEx's anticompetitive conduct and its enforcement of the anti-steering rules are enjoined by this Court.

## Count III:
## Unreasonable Restraint of Competition in Violation of §1 of the Sherman Act

49.     Plaintiff realleges paragraphs 1-48 as set forth above.

50.     AmEx possesses and exercises market power in the relevant market.

51.     The anti-steering rules that AmEx imposes on Plaintiff and other merchants constitute contracts that unreasonably restrain competition within the meaning of the rule of reason and violate §1 of the Sherman Act (15 U.S.C. §1).  Among other things, the anti-steering rules are imposed on Plaintiff and other merchants through vertical agreements that are intended to and do restrain and eliminate *interbrand* price competition from other providers of payment card services that would exist in the absence of the anti-steering rules and raise the prices paid by Plaintiff and other merchants to AmEx to supracompetitive levels.

52.     The anti-steering rules are also anticompetitive because Plaintiff and other merchants, in order to be profitable, must increase their own prices to consumers in order to recover the excessive costs imposed on them by AmEx.  Plaintiff and the other merchants each unilaterally determine their own retail prices, but in doing so each must take into consideration the higher costs it incurs due to AmEx's anticompetitive conduct.

53.     There are no procompetitive justifications for the anti-steering rules and even if such justification existed, any possible procompetitive benefits could be obtained by less restrictive alternatives.

54.     As a direct and proximate result of AmEx's imposition and enforcement of the anti-steering rules, Plaintiff has been injured in its business or property by: (a) being compelled

to adhere to the anti-steering rules; and (b) being charged supra-competitive prices by AmEx that far exceed the prices that would have been charged in an unfettered market in the absence of the anti-steering rules.

55.     As a direct and proximate result of AmEx's imposition and enforcement of the anti-steering rules, Plaintiff is threatened with continuing loss or injury for which it has no adequate remedy at law.  Plaintiff will continue to suffer irreparable injury unless AmEx's anticompetitive conduct and its enforcement of the anti-steering rules are enjoined by this Court.

## Prayer for Relief

WHEREFORE, Plaintiff prays for judgment against the Defendants and for the following relief:

A.     A declaration that Defendant's anti-steering rules are unlawful and that AmEx has violated the antitrust laws in each of the ways alleged above;

B.     An order permanently enjoining the defendants their officers, directors, employees, agents and successors from requiring Plaintiff and other merchants to agree to or enforcing the anti-steering rules against Plaintiff and any other merchant and directing that all such existing contract obligations be rescinded;

C.     An order awarding Plaintiff treble the damages it has sustained on account of Defendants' unlawful conduct as provided in §4 of the Clayton Act (15 U.S.C. §15);

D.     An order awarding Plaintiff its reasonable attorneys' fees and costs of suit as provided in §§ 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26); and

E.     Such other and further relief as the Court deems just.

16

## Jury Demand

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,


Dated: February 25, 2011            By:     /s/David P. Germaine
                                            Linda P. Nussbaum
                                            Susan R. Schwaiger
                                            **GRANT & EISENHOFER, P.A.**
                                            485 Lexington Avenue, 29th Floor
                                            New York, NY  10017
                                            (646) 722-8500
                                            E mail:  lnussbaum@gelaw.com
                                            sschwaiger@gelaw.com


                                            Paul E. Slater
                                            Mitchell H. Macknin
                                            **SPERLING & SLATER, P.C.**
                                            55 West Monroe Street, Suite 3200
                                            Chicago, IL  60603
                                            (312) 641-3200
                                            (312) 641-6492 (fax)
                                            E mail:  pes@sperling-law.com
                                            mmacknin@sperling-law.com


                                            Joseph M. Vanek
                                            David P. Germaine
                                            **VANEK, VICKERS & MASINI**
                                            111 S. Wacker Drive, Suite 4050
                                            Chicago, IL  60606
                                            (312) 224-1500
                                            E mail:  jvanek@vaneklaw.com
                                            dgermaine@vaneklaw.com


                                            *Attorneys for CVS Pharmacy, Inc.*

17